HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KRISTY DOUGLAS and TYSHEKA
RICHARD, individually and on behalf of all
others similarly situated,

                              Plaintiffs,

        v.

XEROX BUSINESS SERVICES, LLC, a
Delaware Limited Liability Company;
LIVEBRIDGE, INC., an Oregon
Corporation; AFFILIATED COMPUTER
SERVICES, INC., a Delaware Corporation;
AFFILIATED COMPUTER SERVICES,
LLC, a Delaware Limited Liability Company,

                              Defendants.

No. 2:12-cv-01798-JCC

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO CERTIFY
COLLECTIVE ACTION

ORAL ARGUMENT REQUESTED

NOTED ON MOTION CALENDAR:
NOVEMBER 20, 2013

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................... 1

II.     FACTS ................................................................................................... 5

        A.      "Xerox" is a Decentralized Group of Independent Companies ........................ 5

        B.      Phone and Time Keeping Systems Differ by Call Center ................... 5

        C.      Agents' Jobs Differ Starkly Depending on their Call Center's Operations ........................................................................................ 7

        D.      Compensation Systems Differ Between Call Centers ..................... 10

III.    ARGUMENT ...................................................................................... 10

        A.      Legal Standard ...................................................................... 10

        B.      Ambiguity and Size of the Classes Are Independent Reasons to Deny the Motion .......................................................... 14

        C.      Defendants Have Legally Compliant Policies ............................. 16

        D.      Plaintiffs Fail to Prove There Is a Company-Wide Policy Encouraging or Allowing Off-the-Clock Work .......................... 16

        E.      Plaintiffs Provide No Evidence of a Company-Wide Policy Involving an Improper Pay Scheme .......................................... 20

        F.      The Proposed Class Is Not Similarly Situated Because of Unique Defenses Regarding Groups of Potential Class Members ............... 22

IV.     MOTION TO STRIKE ...................................................................... 23

V.      PROPOSED NOTICE ....................................................................... 24

VI.     CONCLUSION .................................................................................. 24

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - i
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## I.   INTRODUCTION

Xerox Business Services, LLC has business operations, including call centers, and also is affiliated with other companies that operate call centers. LiveBridge, Inc. is one of those companies, providing services primarily for a single client, Verizon Wireless. Although plaintiffs use the term "call center" as if such operations are all the same, they are mistaken. Call centers operate in different ways, have different policies and equipment, and vary greatly in size. These differences make uniform conclusions about call center operations impossible. Attorney-crafted generalizations pasted in a few declarations cannot change that fact.

Plaintiffs Douglas and Richards both worked for LiveBridge, one in Federal Way and the other in Anderson, Indiana. When deposed, they admitted they have <u>no knowledge</u> (1) beyond their own small teams in their own call centers, Nunn C1 130:25-137:19, 320:12-25; C2 103:14-19, 113:2-3, 159:17-20, 262:10-13, 280:2-8;[1] or (2) of any written policies requiring off-the-clock or unpaid work, *id.* C1 101:2-104:19; C2 188:15-18, 290:2-20, 301:5-303:14, 319:15-321:20. Instead, they claim to have worked off the clock because of comments from a handful of supervisors at their locations. *Id.* C1 127:12-128:16, 157:10-14; C2 290:21-292:4, 294:13-296:25. In addition, plaintiffs submitted vague declarations from four other LiveBridge agents and seven agents of non-defendant companies.[2] Nunn B51 ¶ 18.

A year after filing the Complaint and despite extensive discovery, plaintiffs filed a Motion built on ambiguity and fiction instead of fact. Plaintiffs ask for conditional certification of two seemingly vast nationwide FLSA classes: (1) an off-the-clock ("OTC") class of all persons in the past three years with a "primary duty" of receiving inbound calls for third-party clients; and (2) an "ABC" class consisting of members of the OTC class who were paid in whole or part under piece-rate Achievement Based Compensation ("ABC") plans. The Motion does not explain the scope of the classes and leaves many unanswered questions: How

---

[1] Supporting materials are attached as exhibits to the Declarations of Todd Nunn and Patrick Madden and cited throughout as "Nunn" or "Madden" [¶ or Ex #][page:line or ¶]. For example, the Douglas Deposition is attached as Exhibit C1 to the Nunn Declaration and is cited as "Nunn C1" with the page and line following.

[2] Because plaintiffs have improperly involved non-parties in this action, Defendants have had no option but to respond on their behalf. By this response, the non-party companies do not consent to involvement in this case.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 1
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

is "primary duty" determined? How many class members? How many call centers? How many companies? Plaintiffs do not answer these questions because they apparently do not want to reveal the potentially mammoth scope of their Motion. Instead, they present a fiction of similarly situated employees subject to improper common policies. That fiction unravels as soon as the scope of each class is revealed.

Defendants responded to plaintiffs' request to identify call centers, and initially listed 164 locations operated by Defendants and their affiliates in 38 states. Madden ¶ 3. During the class period, those call centers employed 166,713 employees in many positions with varied duties (collectively "agents"), 54,842 of whom were reportedly paid at least one day under an ABC plan. *Id.* These classes could be larger, since plaintiffs no longer reference "call centers" and do not refer to specific job titles. The classes could also be much smaller, depending on how "primary duty" is applied and if the case is limited to agents of Defendants alone.[3]

The sheer size and diversity of the proposed classes is enough reason to deny the Motion, creating a high hurdle for plaintiffs to prove that these undefined classes are "together the victims of a single decision, policy, or plan." *Burk v. Contemporary Home Servs.*, 2007 WL 2220279 *4 (W.D.Wash. 2007). This hurdle is further raised because the call centers operate as independent businesses, serve hundreds of clients, and are run by different corporate entities with different management structures, different lines of business, and highly individual practices depending on the clients they serve. Nunn B51 ¶ 4-7; Madden ¶ 3. Unable to overcome this hurdle with the facts, plaintiffs have resorted to fiction.

The Motion asserts that Defendants maintain uniform policies requiring agents to work off-the-clock before the start of their shifts, during breaks, and at the end of the day. The proposed OTC class requires proof, at a minimum, of an illegal nationwide policy or practice that violated plaintiffs' FLSA rights. *Hinojos v. Home Depot*, 2006 WL 3712944 *2 (D.Nev. 2006). It is not enough to say call centers have attendance policies, track activities with

---

[3] The Motion creates confusion as to the scope of the classes. It references agents "who have worked for defendants," but seven declarants never worked for Defendants, Nunn B51 ¶18, and the Motion (at 2) appears to target all Xerox-affiliated entities. Of course, the declarants do not identify their specific employer.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 2
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

auxiliary ("aux") codes, or require employees to work hard – such expectations do not violate the law. Thus, plaintiffs attempt to spin improper policies out of whole cloth. The Motion:

- Asserts (at 2) agents "are all expected to log in and load their programs before they clock in and begin their shifts." This is false. The cited exhibits (Pl. Ex. 5-9) say nothing about logging into computers before clocking in, written policies dictate otherwise, and a host of declarants confirm they clock in before logging onto the computer or doing any work. Nunn ¶ 8; A3 ¶ 5.

- Asserts (at 7) "[t]here is no AUX code for booting up computers, logging into programs, or closing down." Again, false. Richard testified she could use system down, and an array of agents confirm the use of a variety of codes for these activities and their completion on the clock. *Id.* ¶ 23; B35 ¶ 10-11; C2 222:7-223:8.

- Asserts (at 9) that "[a]gents are not permitted to clock in early" and "Xerox's policies consistently identified the clock-in time with the shift start time." Once more, false. Douglas and Richard clocked in early. *Id.* C1 151:7-21, 123:13-124:9; C2 155:11-19, 282:1-7. So did other agents. *Id.* ¶ 10; A28 ¶ 5; B49 ¶ 10.

- Repeatedly cites the deposition of Bradley Williams as support for sweeping generalizations about "Xerox" policies and practices. This is misleading, at best. Williams repeatedly testified that he has no knowledge beyond the five call centers he oversees. Nunn B54 ¶ 5 (Williams detailing false characterizations of his testimony).

In contrast to the Motion's unsupported rhetoric, plaintiffs' testimony demonstrates that these assertions are fiction, and there is no evidence of illegal policies or practices. For example:

- Plaintiffs admit there were no written policies requiring off the clock work. Opp. at 1. The only written policies required that all time be reported. Nunn B51 ¶ 8.

- Plaintiffs admit they have no knowledge of practices beyond their own team and call center, and their claims revolve around statements from a few supervisors. Opp. at 1.

- Plaintiffs have stipulated that, although their declarants "use language that could be construed broadly, each declarant only has knowledge of the particular SBU location or locations at which he or she worked, and his or her declaration testimony is intended to pertain only to policies and practices at his or her particular SBU location." Madden ¶ 5, Ex. 1. The declarants introduce no evidence of common written or orally communicated policies for off-the-clock work and, when deposed, admit that they have no knowledge beyond their own limited experiences. Nunn C8 25:18-22, 31:10-19; C9 54:20-55:21, 57:1-59:24.

- Plaintiffs and their declarants introduce minimal evidence for 10 call centers (only three of which are operated by Defendants), leaving 154 call centers and scores of home-workers and other locations with no evidence whatsoever. Nunn B51 ¶ 18.

At best, plaintiffs' evidence suggests that a small handful (less than 1/100th of one percent) of agents at a few centers believe they have personal claims for time worked. This contrasts with over 100 declarations from over 50 call centers attesting that all work time is recorded and paid, off-the-clock work is not expected or tolerated, and a broad collection of written policies

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 3
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

and site-specific practices reinforce these commitments. Nunn ¶ 7 -14; A1-A59; B1-B50; B51 ¶ 8, Ex. 1-5. Taken as a whole, the evidence provides no support for the Motion's claim of a common policy and practice that required off-the-clock work across the proposed class.

The Motion also asserts that Defendants used uniform ABC plans that only paid for selected productive minutes and did not pay for some non-productive time. Plaintiffs again rely on fiction not fact. The mere use of the term "ABC plan" does not mean that every plan is the same. Madden Ex. M at 6 (Judge Atlas Order). ABC plans vary greatly, using different qualitative and quantitative metrics to calculate pay. The Motion (at 14) admits the distinct nature of plans, but asserts "the components that matter to plaintiffs' claims are materially identical." Unfortunately, plaintiffs do not explain what those components are. When presented with ABC plans for other call centers, Douglas and Richard testified they had no knowledge of and could not understand their metrics, and admitted the key plan components are the metrics used to calculate pay (the very components distinctly set at each call center). Nunn C1 298:20-302:7; C2 263:23-266:21; B51 ¶ 17. The Motion's only global assertion (at 14) is that "[i]t is not disputed that plaintiffs were not paid for all of the time that they are clocked in and working." However, this bald assertion is hotly disputed. Different ABC plans for agents who handle inbound calls calculate pay in different ways (using calls, faxes, chats, claims or productive minutes as metrics), Madden ¶ 3, but they all are intended to pay for all time worked. In fact, many plans expressly state: "All time at work is compensated through ABC Pay, except for certain specific activities that the SBU may deem eligible for Additional Pay instead." The FLSA expressly allows this. Hurley Ex. A. If plaintiffs' theory of liability is that agents did not understand the plans or were not fully paid under them, that will require a plan by plan, agent by agent inquiry to show what was understood and paid. Regardless, plaintiffs provide no meaningful evidence on these subjects. In contrast, many agents confirm they knew that ABC paid for all time worked, and they were fully paid. Nunn ¶ 25; A8; A17.

Because the scope of the proposed classes is uncertain and there is no evidence of illegal policies or practices across those amorphous groups, the Motion should be denied.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 4
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## II.     FACTS

Plaintiffs' position is that if you answer phone calls, you are similarly situated. This fact section is to help clarify for the Court how call centers and agents differ, belying plaintiffs' claim that all agents are similarly situated with respect to the proposed classes.

### A.     "Xerox" is a Decentralized Group of Independent Companies

Plaintiffs' classes are undefined and incredibly broad. Xerox is not one company, but many companies, formed by acquisitions over time across the country. Nunn B51 ¶ 4. The Motion uses sweeping language; however, most of these entities are not parties to and have no relation to this lawsuit, and plaintiffs have introduced no evidence about them. Different entities are often focused on different lines of business, and there may be one or more groups targeted to an industry or client. *Id.* ¶ 5. Each group operates independently and has its own management structure, and the application of policies varies from one group to the next. *Id.*

Within the groups are individual call centers, or strategic business units ("SBUs"). *Id.* ¶ 6. Generally, each SBU services one client. There may be more than one SBU at a location or a location may have only a single SBU. *Id.* SBUs operate in a decentralized manner, each running like a small business. This independence allows SBUs to adopt day-to-day policies and procedures that comply not only with Defendants' overarching policies but also with the particular needs of their clients. *Id.* ¶ 7. Each SBU handles its own training, which is generally developed in conjunction with the client. *Id.* Plaintiffs have introduced evidence only at the SBU level. Plt. Ex. 5-9. The policies they claim are "Xerox policies" are only local policies.

### B.     Phone and Time Keeping Systems Differ by Call Center

Phone systems used by agents differ in design and use depending on the SBU, the client it serves and the work that is done there. Nunn B51 ¶ 14. There are "hard phones," which look like any business phone, and "soft phones," used through the computer. Phones are often used for taking calls and tracking an agent's time. Many phone systems have different work states or aux codes. *Id.* ¶ 15. These different states can control whether the phone will receive incoming customer calls. Aux codes vary and may be used differently.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 5
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Frequent aux codes are "default, available, unavailable, coaching, after call work, system issues, and break." Nunn ¶ 23. Some SBUs have "system start up" and "gone home" codes. *Id.* B35; B31. Supervisors, managers, and workforce management[4] employees may monitor what aux code agents are in as part of managing the SBU. Some systems automatically put agents into specific aux codes under particular circumstances, while others require manual selection. Even when automatic, agents can change the code with the press of a button. *Id.* B51 ¶ 15.

There are also numerous different systems for tracking time:

- **Hard phone systems.** These look like regular phones with extra buttons. Agents clock in by keying their ID number into the phone, at which point they are being paid. Generally, aux codes are assigned buttons on the hard phones, or are selected by keying in numbers. Rockwell, Avaya, and Cisco are three examples of hard phone systems. Typically, agents cannot use a hard phone until they have clocked into it.

- **Soft phone systems.** Agents clock into these by logging into their computer, opening the phone system and then clocking into it. Aux codes are selected on the screen. Calls are taken on headsets connected to the computer.

- **FEPS ("Front End Payroll System").** FEPS is generally, but not always, the payroll system used by call centers to track an agent's time and pay. That information can be fed into FEPS by phone systems; however, some SBUs have agents clock directly into FEPS. Agents log into their computer, open FEPS, and clock into it. Clocking out and taking breaks is all controlled on the computer screen.

- **Other computer systems.** Call centers that are acquired often use whatever legacy systems were already in place, such as ADP, Replicon, Consultrak, and DATIS.

- **Manual methods.** For activities like new hire training, time is frequently tracked either by signing a sheet or by somebody else entering the trainee's time.

Nunn B51 ¶ 16. These systems differ between SBUs and may have changed over time. *Id.*

Agents are allowed, encouraged, and in some SBUs, required to review and approve their time periodically. *Id.* ¶ 13; A15 (weekly); A11 (each pay period). Many review their pay and statistics on a daily basis. *Id.* A5 (daily). Agents are able to ask questions about pay, and seek and obtain corrections. *Id.* ¶ 16; A19 (supervisor has fixed occasional mistakes).

---

[4] The Motion asserts that there is a global workforce group that oversees all operations in all call centers. Again, false. There is a global workforce group for Brad Williams' five Verizon call centers that primarily prepares schedules and reports; however, there is no such group that oversees or coordinates all call center operations. Nunn B51 ¶12-13; B54 101:22-24 (Williams: global workforce is for his sites); B53 (local workforce).

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 6
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

**C.      Agents' Jobs Differ Starkly Depending on their Call Center's Operations**

Call centers are all different. They vary in size from under 50 agents to almost 1000. The management structure can vary from one manager and a few supervisors to layers of management with scores of supervisors. *Id.* B51 ¶ 11. The facilities differ physically and in the work that is done there. Walking through an agent's day will demonstrate these differences.

Like all employers, call centers want their workers to be on time. SBU schedules are highly variable depending on client needs. Some SBUs have a single shift and others run around the clock with dozens of overlapping shifts. *Id.* B22. The first thing most agents do is access the building with a security badge or keypad. *Id.* A15 (punch code); A26 (scan badge). The number of security doors and the distance to their work area will differ. Agents then often engage in personal activities. *Id.* A3 (restroom); A7 (fill water bottle); A8 (go to locker); A17 (socialize); A21 (cellphone and smoke); A44 (set out pictures); A54 (put food in refrigerator).

When ready to work, agents go to their workspace. Some have assigned seating, some work at home, and some have designated rows of seats by supervisor. *Id.* ¶ 19; A1 (assigned); A41 (team row). Others have "hot seating," which means an agent must find an open seat. Douglas admits hot seating is very different than assigned seating. *Id.* C1 309:5-12. If agents are delayed in finding a seat, SBUs have different methods to assure that they are paid for this time. *Id.* A23 (clock in at supervisor desk); A10 75:20-76:8 (tell supervisor).

Agents then clock in. They punch a number into their hard phone, or they log into their computer, open their soft phone or other system, and type in a number. This takes seconds. *Id.* ¶ 9; A6 (2-3 seconds); A30 (5 seconds); A16 (20 seconds). Agents are instructed to clock in before they do any work, and they just do that. Nunn ¶ 7-8; C3-C7 (the former opt-in *Jones* plaintiffs all admit they clock in first thing, before they do any work).

A few agents feel the need to clean their computer or phone, others do not. Nunn C2 277:1-9 (Richard didn't). This will vary based on whether there is assigned or hot seating, and personal cleanliness standards. Nunn C1 312:22-313:4 (Douglas only cleaned if sitting in a

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 7
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

new seat). Again, this is not an issue for home workers.

Most SBUs keep their computers on, *id.* ¶ 20; B2 (always on); but some agents may need to turn them on. Douglas claims this took 3-4 minutes, but admits new computers and having the computers remain on would make a "big difference." *Id.* C1 310:13-311:8. SBUs that require computers to be booted have different approaches for paying for this time. *Id.* B23 (supervisors add 5 minutes to pay for computer boot time).

Next, agents need to open computer programs necessary for them to take their first call (other programs can be opened, as needed, while on a call). The types of programs that agents need to open will differ by the client, job, and SBU. *Id.* ¶ 21; A13 (1 program); A24 (8 programs). Generally, clients provide these programs, such as customer databases and booking tools. The number and type of programs that agents have to open to take the first call (together with the age and speed of the computer) will affect the amount of time that agents need to become ready. *Id.* ¶ 22; A54 (30-60 seconds); A10 (2-5 minutes); C2 273:13-17. SBUs have different practices regarding how early an agent can clock in before their shift. *Id.* ¶ 10. And, they have different practices for what aux code an agent should use while opening programs. *Id.* ¶ 23; B35 (system start up); B26 (log in prep); C2 222:7-223:8 (Richard told to use system down). Some SBUs allow agents to clock in at their scheduled time and open programs after their shift has started. *Id.* B6 (7 minute buffer and 1 minute grace period); B25 (5 minutes to set up computers). It all depends on the agent's shift, client demands, and the SBU's call volume (which can vary by season, time of day and randomly). Some SBUs automatically add a few minutes of clock time to account for any time logging into the computer before clocking in (usually with computer-based time clocks). *Id.* B6 (3 minutes). A host of agents confirm they clocked in first and then opened programs. *Id.* ¶ 8; A50.

Although agents generally handle calls of some kind (perhaps in addition to chats, emails, texts, faxes, projects, hearings, training, floor-walking, etc.), whether their primary duty is handling inbound calls can differ. *Id.* B5 (calls, emails and on-line chats); B17 (faxes between calls); C11 102:6-104:13 (Green did not take calls 3 of 5 days per week). Some

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 8
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

handle only incoming customer calls; others also make outbound calls. *Id.* B2 (inbound and outbound). Some handle service, technical support, and financial services calls, and some make sales, book trips, or engage in other kinds of calls. *Id.* B38 (inbound and outbound sales). The length of calls, the documentation completed during calls, and what needs to be done after a call will vary by SBU. *Id.* B16 (1-2 hours of after-call research); B32 (after call work rare). Whether agents need to review announcements, e-mails, and client updates, and whether it can be done before or between calls, also vary. Some SBUs have high call volumes and agents have little time between calls, while others have lower volume, or slower seasons or shifts, allowing down time between calls. *Id.* B8 (steady calls); B47 (5-10 minutes between). In any event, agents can use a variety of aux codes to do follow-up work, including client callbacks. *Id.* ¶ 23; B2 (after call work); B15 (outbound); B8 (special projects).

The law regarding rest and meal breaks will differ depending on the state in which the SBU is located. There may be differences in the way breaks are scheduled and tracked - some SBUs have computer programs that remind agents when to take breaks. *Id.* A19 (prompted by computer). Breaks are often tracked with an aux code, and agents clock out and in for lunch, but that can differ by SBU. Regardless, agents confirm they get appropriate breaks. *Id.* ¶ 27. In fact, Douglas admitted that any work during breaks was minimal and her team actually had issues with agents taking too long on paid breaks. *Id.* C1 234:17-235:16.

At the end of their shift, agents usually log out of most of their programs during their last call. *Id.* B7 (close programs as wrap up last call). They can then select an aux code that stops incoming calls so they can finish up any work and log out of remaining programs and the computer. *Id.* ¶ 23; B2 (after call work); B21 (end of shift); B31 (gone home); B48 (aux 0). The last thing they do for the day is clock out and leave. *Id.* ¶ 11; A35; A53.

Plaintiffs were both employed by Livebridge, worked in large, high-volume Verizon call centers, sat in supervisor specific areas, clocked in on a hard phone, had to open only one program (Verizon's ACSS database) to be ready to take their first call, and were apparently confused about the attendance policy and aux codes available for various tasks. *E.g.*, *id.* C2

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 9
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

280:7-283:23, 290:21-296:5. There is no evidence they are similarly situated with agents in small SBUs, with assigned seats, soft phones or other timekeeping systems, who had lower volume or different types of calls, needed to open different programs, and understood and complied with local attendance policies and aux code options at their SBUs.

**D.    Compensation Systems Differ Between Call Centers**

Call centers decide how to compensate agents. SBU approaches include:

- **Set hourly compensation.** Trainees are typically paid a flat hourly rate. In addition, some SBUs pay all agents a set hourly rate.

- **Variable hourly compensation.** Some SBUs use Results Based Compensation ("RBC") plans, where agents are paid an hourly rate when handling customer calls that is periodically adjusted based on qualitative and quantitative performance criteria established by each SBU. These hourly rates can vary widely from site to site and from agent to agent. Agents under RBC plans also receive a set hourly rate for time spent in certain specified activities (*e.g.*, training and meetings).

- **Incentive piece-rate pay.** Some SBUs use ABC plans, which usually involve two types of pay: (1) Additional Pay, which is hourly pay for the time spent on certain designated activities (*e.g.*, training and meetings); and (2) ABC Pay, which is calculated using ABC Pay Rates and which is paid for all remaining time and activities. Qualitative measures (*e.g.*, customer satisfaction) and efficiency measures (the length of calls) determine the ABC Pay Rate, which is then multiplied by units of production to produce the ABC Pay for the week. The units of production can be client calls, minutes spent doing particular tasks, bookings, chats, sales, or hearings. Any unit of production can function under ABC. Each SBU has its own ABC plans, and the metrics the SBU uses are often dependent on the particular contract with the client. Thus, the metrics and piece rates will vary between SBUs. Finally, ABC plans typically establish a "subsidy pay rate" at or above the minimum wage that is paid if an agent's pay under an ABC plan falls below that rate.

Nunn B51 ¶ 17. Douglas testified she has no claim when paid hourly, and that hourly pay with incentives, like RBC, is "fundamentally different" than ABC pay. *Id.* C1 182:5-18, 302:3-7.

## III.    ARGUMENT

**A.    Legal Standard**

"A majority of courts, including district courts in the Ninth Circuit, have adopted an ad hoc, two-tiered, case-by-case approach for actions brought under the FLSA." *Velasquez v. HSBC Fin. Corp.*, 266 F.R.D. 424, 427 (N.D.Cal. 2010). Determining whether a collective action is appropriate is within the discretion of the district court. *Id.* It is plaintiffs' burden to

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 10
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

demonstrate that members of the proposed class are "similarly situated." 29 U.S.C. § 216(b); *Smith v. T-Mobile USA, Inc.*, 2007 WL 2385131 *3 (C.D.Cal. 2007). To accomplish this, they must present "substantial allegations, supported by declaration or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.'" *Burk*, 2007 WL 2220279 *4. Conclusory statements and unsupported assertions of FLSA violations are not sufficient to meet plaintiffs' burden. *Velasquez*, 266 F.R.D. at 427.

In attempting to certify a <u>nationwide</u> class, a plaintiff must show a common and improper company-wide decision, policy or plan. *Hinojos*, 2006 WL 3712944 at *2 (denying certification at notice stage because the "Court has not been presented with evidence of any improper common practice, policy, or culture at Home Depot that would justify conditional certification on a nationwide basis...[p]laintiffs ask the Court to conclude that a national policy exists based on limited assertions pertaining to a few stores").[5] If plaintiffs cannot demonstrate a "company-wide policy or plan," and simply show the actions and decisions of individual supervisors, then certification as a collective action is not appropriate. *Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360 *7 (E.D.Wis. 2008) ("Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan are not appropriate for collective treatment."). Moreover, differences between the proposed class members in geography, work site, payment method and corporate affiliation weigh against a finding that class members are similarly situated. *Sheffield*, 211 F.R.D. at 413 ("The class members have been employed by different subsidiaries and affiliates of defendant...held different job titles, enjoyed different payment structures (piece-rate, hourly, and salaried), and worked at nine different job sites...[t]hus, the dissimilarities

---

[5] *E.g., Syrja v. Westat, Inc.*, 756 F.Supp.2d 682, 687-88 (D.Md. 2010) (denying conditional certification because plaintiff "offered no evidence that even begins to suggest that [defendant] currently maintains, or that it ever maintained, a uniform national policy of denying appropriate compensation for employee hours worked over 40 in a given week"); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D.Or. 2002) ("Plaintiffs have failed to offer sufficient evidence to establish that the putative class members were commonly affected by a uniform plan or scheme to deny workers overtime compensation and minimum wages."); *Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705 *2 (N.D.Cal. 2008) ("Plaintiffs have not identified a common policy or practice on a nationwide or statewide basis, and indeed the official written policy at Wells Fargo is to pay overtime to non-exempt employees" and plaintiffs claim "off-the-clock hours worked under a variety of different circumstances").

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 11
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

among the putative class members extend to geography, work sites, and payment systems.").

As plaintiffs note, courts sometimes apply a "lenient" standard during the notice stage; "[h]owever, where the parties have had an opportunity to conduct pre-certification discovery, courts tend to hold plaintiffs to a higher standard of proof." *Luksza v. TJX Co., Inc.*, 2012 WL 3277049 *9 (D.Nev. 2012); *Smith*, 2007 WL 2385131 at *3-4. "[W]here the parties have conducted discovery, courts will consider all the evidence before it and apply a heightened standard in making a determination on conditional certification." *Luksza*, 2012 WL 3277049 at *9 (4 months of discovery, depositions of seven plaintiff/opt-ins and four 30(b)(6) corporate designees, 5,000 pages of documents, and 20 declarations warranted intermediate standard); *Hawkins v. Alorica*, 287 F.R.D. 431, 439 n.3 (S.D.Ind. 2012) (applying intermediate standard after 10 depositions, 6,000 pages of documents, and 15 declarations).

Here, plaintiffs have engaged in sufficient discovery to warrant the intermediate standard. In this case and the accompanying *Hill* case (from which plaintiffs arranged to use discovery), plaintiffs have had over a year to conduct discovery, deposed a vice president and 7 30(b)(6) designees, served 45 interrogatory subparts and 77 document requests, received 123,899 pages of documents and 472,950 pages of electronic production, and submitted 11 opt-in declarations. Madden ¶ 3. This level of discovery far exceeds the requirements for applying the heightened standard. Regardless, even under the lenient standard, the Motion should be denied because there is no evidence of a "single decision, policy, or plan."

The Motion (at 15 n.11) cites call center cases allowing notice, but with no analysis. The cases are distinguishable: they deal with far smaller classes, fewer call centers, a single company's clients, little discovery, and no conflicting evidence. *Hawkins*, 287 F.R.D. at 441, distinguishes virtually every case plaintiffs cite as "decided under the lenient standard applied before significant discovery had taken place, and where defendant had not presented any conflicting evidence to indicate either that a policy or practice did not exist, or that it was not company-wide." Here, there has been substantial discovery and Defendants have submitted considerable evidence. Plaintiffs' authority is further distinguishable because it deals with

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 12
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

homogeneous operations. For example, *Burch v. Qwest Com. Int'l Inc.*, 500 F.Supp.2d 1181, 1190 (D.Minn. 2007), involved a smaller class (8,000) and call centers serving only Qwest customers, and defendant admitted "using a nationwide centralized monitoring system," "using the same system to record all employees hours: the telephone," using "the same telephone system," and having no difference in computer and software start-up time across centers and states. Here, there are no such admissions, there is substantial evidence that processes and timekeeping and phone systems differ, and computer systems take various times to start up in different locations.[6] Plaintiffs' other authorities are also distinguishable.[7]

More on point is *Hawkins*, 287 F.R.D. at 441, which denied conditional certification of a case with very similar allegations of OTC pre-shift work (including time spent pulling up computer systems). Applying the intermediate standard, the court reviewed evidence submitted by the parties and found that defendant had "rebutted [plaintiff's] assertion that it had a company-wide policy or practice throughout the Terre Haute call center of requiring CSRs to perform uncompensated pre- and post-shift work." Like in this case:

> [Plaintiffs'] documentary evidence, even taken as a whole, does not demonstrate the existence of such a policy or practice. The Handbook Document merely provides that a CSR is considered late if he or she is not logged in to the phone and ready to work at the shift's start time.[] It does not say anything about logging on to the computer or performing other work before logging in to the phone system, being ready to take calls right at the beginning of a shift (which would arguably mean being logged on to the computer before that time, since access to the computer system is presumably required in order to effectively handle a call), or logging off before completing all work for the day.

*Id.* at 440. While Hawkins' evidence supported "the conclusion that some supervisors or trainers may have instructed CSRs that they were required to log in to their computers and

---

[6] Just how different *Burch* is from this case becomes clear when facts developed in a later stage of the case are considered: "Plaintiffs' primary job duties are answering inbound calls from Qwest customers," "are subject to the same company-wide time monitoring and compensation policies," "type of chains of command, and time monitoring practices are consistent across different call centers," and "[b]ecause the same computer systems were used across the class, the reasonable amount of time spent conducting these activities can be established at trial and extrapolated to the class." 677 F.Supp.2d 1101, 1107, 1116-17 (D.Minn. 2009).

[7] *E.g., Fisher v. Michigan Bell Tel. Co.*, 665 F.Supp.2d 819 (E.D.Mich. 2009) (using lenient standard with 6 call centers in one state); *Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D.Pa. 2009) (using lenient standard and only certifying 4 call centers for which there were declarants because defendant did not dispute basic claim); *Robinson v. Ryla Teleservs.*, 2011 WL 6667338 (S.D.Ala. 2011) (certified one call center under lenient standard and plaintiff allowed no discovery); *Allerton v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 132454 (D.Nev. 2009) (one call center).

---

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 13
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

pull up their systems before logging in to their phones," it did not show a policy or practice throughout the call center. *Id.* And, defendant's management declarations, showing that its policy was to pay agents for all work and that the first thing they should do was log into the phone system, was enough to rebut the claim of an improper policy and practice. *Id.* at 441. Similarly, here, plaintiffs' documentary evidence does not show a policy or practice allowing OTC work, their declarants only present conclusory statements that, at best, support improper acts of a few supervisors, and Defendants have rebutted that evidence.[8]

**B.      Ambiguity and Size of the Classes Are Independent Reasons to Deny the Motion**

Plaintiffs have failed to clearly identify the members of their proposed classes. Although they propose classes of "defendants'" employees, most of their opt-ins never worked for one of the Defendants, and their Motion appears to target all Xerox-affiliated entities. The agents potentially included in plaintiffs' vague and overbroad classes could include employees from different companies, different groups, and different call centers, each under different management structures. This alone is reason to deny conditional certification. *Sheffield*, 211 F.R.D. at 413 (conditional certification denied in part because "[t]he class members have been employed by different subsidiaries and affiliates of defendant").[9]

Plaintiffs create further ambiguity by defining the class, not by job title, but by an employee's "primary duty" of receiving inbound calls for third-party clients. Because a

---

[8] *E.g., Adair*, 2008 WL 4224360 at *6-*7 (denying notice certification in call center case alleging pre- and post-shift work, including opening computer programs, because plaintiffs' declarations did not support a common policy–they provided no facts to suggest that supervisors, other than plaintiffs' own, observed employees working off-the-clock and permitted it); *Russo v. Bellsouth Telecomm., Inc.*, 2009 US Dist. LEXIS 20552 *27-28 (N.D.Ga. 2009) (denying notice in a call center case alleging pre- and post-shift work, including opening programs, because plaintiffs' declarations gave no indication that defendant actually required the declarants to log in early–declarations merely stated "Defendant expected me to be ready to take a call at the start of my tour," but gave no reason why they believed that); *Hart v. JPMorgan Chase Bank*, 2012 WL 6196035 (M.D.Fla. 2012) (denying notice in call center case alleging pre- and post-shift work because individual inquiries were needed, including "whether plaintiffs actually worked 'off the clock'" and "supervisors were aware of" it).

[9] *Syrja*, 756 F.Supp.2d at 688 (case would require individual examination of work "across multiple geographic locations throughout the country, over different time periods, in offices run by different manager"); *England v. New Century Financial Corp.*, 370 F.Supp.2d 504, 511 (M.D.La. 2005) (denying certification because plaintiffs failed to show "similarly situated" because "[i]t is clear that this case involves a multitude of different managers at different geographical locations across the country [and] that individual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location")

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 14
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

determination of an employee's "primary duty must be based on all the facts in a particular case," *Hernandez v. United Auto Credit Corp.*, 2010 WL 1337702, *3 (N.D.Cal. 2010), and agents have varied responsibilities that often extend beyond receiving calls (*e.g.*, emails, chats, faxes, outbound calls, and floor walking), there is no possible way for the Defendants or the Court to accurately determine who is in the class and who gets notice without first engaging in an individual assessment of varied job duties, including the time spent handling incoming calls and other agent activities. In such circumstances, certification should be denied. *E.g.*, *Blake v. Hewlett-Packard Co.*, 2013 WL 3753965, *8-9 (S.D.Tex. 2013) (denying conditional certification because job duties did not show similarity across class).

Additionally, the possible size of the class is reason to deny the Motion. Although the Motion fails to describe what companies, call centers, agents and home workers are part of the proposed classes, and Defendants and the Court are left to guess, the size could be vast (164 SBUs, 38 states, 200 clients, and 166,713 agents). Madden ¶ 3. Regardless, plaintiffs' evidence is simply insufficient in light of this breadth.[10] Finding a few unhappy employees out of 166,000 who are willing to join a lawsuit is not evidence that all agents are similarly situated. Counting the 11 declarants and two plaintiffs, the sample size of plaintiffs' evidence is about 2/100ths of one percent of the total ABC population, and less than 1/100th of one percent of the total agent population. Plaintiffs have minimal evidence from 10 call centers and no evidence at all from 154 SBUs, as plaintiffs and declarants admitted they have no knowledge beyond their own call center (or even supervisors).[11] There is no evidence that these agents (from different companies and call centers) are similarly situated and were

---

[10] *Rappaport v. Embarq Management Co.*, 2007 WL 4482581 *4 (M.D.Fla. 2007) (denying certification in call center case where 6 affidavits from two call centers were submitted to support certification of all locations nationwide because, "[a]t most, these affidavits support the position that certain employees at the [two Florida] offices were required by their supervisors to work overtime…[but] offer no basis to assume that Defendants deny overtime compensation on a company-wide scale"); *Beecher v. Steak N Shake Op., Inc.*, 904 F.Supp.2d 1289, 1299-1300 (N.D.GA. 2012) (plaintiffs and opt-ins representing 11 of 400 restaurants and 23 of 65,000 employees was insufficient to certify nationwide class).

[11] *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161 *4 (S.D.Cal. 2008) (denying certification in part because "[p]laintiffs' affidavits … provide no real evidence beyond their own speculative beliefs, suggesting that all JPMorgan loan officers across the country, regardless of location or experience, receive the same compensation and are required to work in the same manner")

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 15
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

subject to a single illegal decision, policy, or plan.

**C.      Defendants Have Legally Compliant Policies**

Defendants provide access to and expect their agents to comply with legally compliant policies that are independently distributed and set forth in online Employee Guidebooks:

- **Pay all time worked.** Agents are paid for all hours worked, including any overtime.
- **Accurate time reporting.** Agents are required to accurately report time worked. They are expected to clock in before doing any work and clock out only after they complete all work. And agents are asked to review their time each pay period.
- **No OTC Work.** Agents are prohibited from working off the clock and managers and supervisors are strictly prohibited from suggesting – expressly or implicitly – that agents do so.
- **Overtime Pay.** Agents who work overtime are paid their regular rate for all hours worked plus an additional half (0.5) of that rate for all overtime hours.
- **Break Policy.** Agents are paid for rest and meal breaks in compliance with state law.

Nunn B51, ¶ 8, Exs. 1-5; B1-B50.

**D.      Plaintiffs Fail to Prove There Is a Company-Wide Policy Encouraging or Allowing Off-the-Clock Work**

There is no evidence of a written company-wide policy, or even a local SBU policy, that requires or encourages agents to work OTC, whether before, during or after their shift. Plaintiffs produced no such policies in discovery, and admitted the lack of such policies in their depositions. Nunn C1 101:2-104:19; C2 319:15-321:20. Indeed, all written policies forbid such behavior.[12] Being unable to introduce evidence of a policy that does not exist, the Motion (at 2) seeks to create the mis-impression with this Court that there is such a policy by citing plaintiffs' exhibits 5-9, attendance policies from a few SBUs, as supporting the statement that employees were "expected to log in and load their programs before they clock in and begin their shifts." None of the cited exhibits show such a policy, or anything like it. These local attendance policies do not mention computers; they simply state an employee who clocks into the phone more than a minute after the start of a shift is tardy.

The Motion next seeks to create the impression of an "implied" policy encouraging

---

[12] See *Syrja*, 756 F.Supp.2d at 687-88 (denying notice – plaintiff offered no evidence of a uniform national policy of denying proper pay and "only concrete evidence before the Court relevant to a national policy with respect to overtime pay is official policy … that it will compensate its employees for all … hours worked").

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

OTC work, by asserting a class-wide policy that: (1) agents must be ready to take calls "the moment" their shift begins, and (2) agents are not allowed to clock in early. The Motion (at 6) boldly states that "[t]hroughout Xerox's call centers there is a policy and practice that agents must be clocked into their phones and in an 'available' status, ready to take phone calls, at the moment their shift is scheduled to begin." This is false. This sweeping statement cites exhibit 6, the attendance policy for one small call center in Spokane.[13] The remaining attendance policies, Pl. Ex. 5, 7-9, from individual SBUs, state only that "Logging into the ...phone 1 minute after a scheduled start time or after an allotted lunch period will be considered a tardy."[14] See Pl. Ex. 7; Nunn C2 169:8-21, 172:3-7 (Richard admits her attendance policy did not require immediate availability). The Motion (at 9:15-17) also states that "[a]gents are not permitted to clock in early to accomplish mandatory pre-shift tasks." This is false. It is not supported by any written policy, only by some declarants' boilerplate statements. This is contradicted by testimony from other agents, plaintiffs' deposition admissions, declarations from managers at declarants' SBUs, written communications to agents at particular SBUs, and specific time records showing repeated early punches for plaintiffs. Nunn ¶ 10; A42; B49; C2 155:16-19 (Richard clocked in before her shift "the majority of the time"). The Motion (at 9:18-20) tries to bolster the implied policy argument by claiming there is no "aux code" designated for pre-shift or post-shift work or time spent loading or closing software. This is also false. Some call centers have specific codes for these tasks, *id.* B26 (log in prep); B35 (system startup); and each call center instructs agents what aux code to use when opening and closing software. Nunn ¶ 23, B1-B50.

Plaintiffs' express and implied pre-shift OTC argument fails. There is no evidence of a class-wide, or even call-center-wide, policy. Indeed, plaintiffs' use of attendance policies

---

[13] And while this 48-employee SBU does instruct agents in writing that they will be considered tardy if they are not ready to take calls within a minute of shift start, plaintiffs' own exhibit 28 contains written communications from that SBU's management advising agents that they should clock into the phone system 3 minutes ahead of their shift in order to log into their systems. They are thus paid for their pre-shift start-up time. Nunn B47 ¶8.

[14] Plaintiffs state on page 6 that "[e]ntering 'available' status even one minute late is considered tardy," citing exhibits 5-10. As discussed above, other than exhibit 6, the Spokane policy, this is a complete misrepresentation of what these exhibits say. Plaintiffs make the same misrepresentation on page 9, lines 16-19.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 17
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

from different call centers to support its OTC argument shows that plaintiffs will not "rely on common evidence in proving the merits of their collective case." *Trinh*, 2008 WL 1860161 at *4 (factor in denying certification). The opt-in declarations do not state that employees were actually told not to clock in before opening programs, and they fail to explain why the declarant believed (1) there was a policy that they could not clock in before their shift or (2) that they needed to work OTC.[15] If they testify to any communication with the company,[16] they generally testify that a supervisor or trainer told them they "had to arrive at work early enough…[to] open all the necessary programs…and be prepared to take my first call at my scheduled shift start time," but they do not state that they were instructed this work had to be done before clocking in.[17] Nunn C2 280:7-17 (Richard told to be early, but not told not to clock in). This testimony fails to establish a company policy, or similarity between potential class members. *Russo*, 2009 US Dist. LEXIS 20552 *27-28, 35 (denying conditional certification for lack of evidence in plaintiffs' declarations). The conflicting testimony of plaintiffs, their declarants, and other agents submitted by Defendants shows that, at most, the issues here are highly individualized based on communications by particular supervisors. An individual inquiry will be necessary to determine whether OTC work occurred pre-shift, and if so, how often, how much, and whether that SBU's management knew about it. *Hart*, 2012 WL 6196035 at *5 (denying notice because divergent testimony in declarations would require individual inquiry into whether OTC work occurred and whether company knew).

Plaintiffs' post-shift OTC claim that they had to clock out of the phone system before they shut down their programs fails for the same reason as their pre-shift OTC claim -- there is no evidence of a companywide policy or practice. Plaintiffs evidence for this claim is one of two form statements by their declarants, either: (1) "Xerox also had a policy that required me to close my open computer programs and log out of my computer after clocking out of the

---

[15] *E.g.* Hawkins Dec. ¶ 5 ("To be prepared to receive inbound phone calls at the start time of my scheduled shift, I had to arrive early and perform work before I was allowed to clock in to the timekeeping system -- that is, before the start time of my scheduled shift.").

[16] Crawford Dec. and Fodor Dec. (no testimony of communications).

[17] Hawkins Dec. ¶ 8; Green Dec. ¶ 8; Belgrano Dec. ¶ 8, 9.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 18
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

timekeeping system;"[18] or (2) "[a]t the end of my shift, I had to sign out of the telephone system to stop inbound calls from coming in…[after] I signed out of the telephone…all work…was unpaid."[19] There is no evidence of a written or implied policy. There is no reason given for the declarant's belief that there was such a policy. Declarant's statement that they couldn't stop incoming calls without logging out of the phone is false. Any aux code other than "available" will stop incoming calls. Nunn ¶ 23. A conclusory statement of a declarant's belief that fails to give any reason for that belief is not evidence of a policy. *Russo*, 2009 US Dist. LEXIS 20552 *27-28. Plaintiff Richard seems to have simply misunderstood end of day shut down. She was told that she could not be in the "call work" aux code when she shut down programs, but she was never told she couldn't be in another aux code. Nunn C2 290:21-292:4. She didn't know and she apparently didn't ask. *Id.* That does not evidence a policy. On the contrary, there is substantial evidence that calls could be stopped and that company-wide policy was to clock out after shutting down the programs. Nunn ¶ 11.

Plaintiffs also claim that "follow-up" work had to be completed in between calls or on your own time.[20] Again, these are conclusory statements in the declaration with no articulation of a reason they believed what they say. There is no evidence of a written or implied policy. There is no evidence of any company communication on this issue. The premise, that follow up work had to be done OTC because there was no time between calls, or because it was "non-productive time," will differ between call centers and agents. Some call centers have time between calls, less or no follow up work, and consider follow-up work to be "productive minutes." In contrast to plaintiffs' lack of evidence, there is substantial evidence that agents knew not to work off the clock, and did not. Nunn ¶ 12-14. Different SBUs also had different aux codes for them to use for follow-up work. *Id.* ¶ 23. Additionally, there are substantial differences between the declarants' claims about the type of OTC work done, and

---

[18] Clinton Dec. ¶ 13; Tielke ¶ 6 (doesn't even state it was a policy); Crawford ¶ 8; Sales ¶ 13; Chard ¶ 8.
[19] Fodor ¶ 7; Belgrano ¶ 13; Green ¶ 14; Hawkins ¶ 12; Sales ¶ 13; Cummings ¶ 12.
[20] E.g. Crawford ¶ 12; Hawkins ¶ 10; Green ¶ 11.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 19
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the allegedly time spent.[21] A unified policy would produce unified results. And if plaintiffs are claiming they have been pushed into OTC work by the fast paced nature of the work and the pressure of the ABC plan, this does not prove a policy or support certification.[22]

Finally, by advancing an ABC subclass, plaintiffs admit that members of the OTC class who are not paid under ABC are substantially different. Many agents and SBUs have never used ABC pay. Nunn ¶ 24; Madden ¶ 3. Since both Douglas and Richard were paid under ABC, the 111,871 agents who were never paid under such a plan cannot possibly be characterized as similarly situated under the FLSA.

## E.   Plaintiffs Provide No Evidence of a Company-Wide Policy Involving an Improper Pay Scheme

The Motion (at 4-5) asserts that ABC plans only pay agents for productive time and not for unproductive time, but it does not address the two most important things: the law and the language of the plans. The law is set forth in 29 CFR § 778.318(c), which provides that an employer and employee may agree that compensation calculated based on certain productive activities may compensate for all hours worked (including non-productive time). Hurley Ex. A. This approach to compensation is nothing new–it is used everyday with salespeople (where commissions from sales cover both sales and non-sales activities), pieceworkers, drivers paid for mileage, and in many other circumstances. The FLSA does not impact the right of parties to enter compensation agreements as long as statutory minimum wage and overtime requirements are met. *Southern Ry. Co. v. Black*, 127 F.2d 280 (4th Cir. 1942).

Plaintiffs' counsel Dan Johnson and LiveBridge are both familiar with this issue. Mr.

---

[21] *Compare* Crawford ¶ 14 (8 hours a week OTC taking work home), Tielke ¶ 8 (an hour a day doing "pends" on lunch and after shift), *and* Belgrano ¶ (1 hr 15 working lunch and after shift) *with* Nunn C2 307:20-308:14 (Richards had 15 minutes per week) *and* Nunn ¶14-15 (no OTC work).

[22] *Brechler v. Qwest Com. Int., Inc.*, 2009 WL 692329 *3 (D.Ariz. 2009) (decertification granted because plaintiffs did not produce evidence of a unified policy, but instead plaintiffs alleged "a subtler system of pressure and coercion that, ultimately, appears to have been backed or not by the individual managers [and while] [t]his system might have been supported implicitly by central corporate policies... Plaintiffs were not affected equally or in the same manner by this system"); *Boelk v. AT&T Teleholdings, Inc.*, 2013 WL 261265 *12, *15 (W.D.Wis. 2013) (conditional certification denied because allegations that "the combination of the meal break restrictions and defendants' efficiency and performance system caused them to work during their unpaid meal breaks without reporting their time" did not establish class were victims of a common policy or plan).

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 20
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE  (206) 623-7580
FACSIMILE  (206) 623-7022

Johnson brought a prior lawsuit asserting that LiveBridge's ABC plans did not include a specific agreement as required by section 778.318(c). In one brief he explained:

> The same federal regulation explains that there is an exception to this rule for workers, including pieceworkers, where the employer and employee have an agreement that the pay they receive for "productive" work hours will cover non-productive hours as well.
>
> For example, while it is not proper for an employer to agree with his pieceworkers that the hours spent in down-time (waiting for work) will not be paid for or will neither be paid for nor counted, it is permissible for the parties to agree that the pay the employees will earn at piece rates is intended to compensate them for all hours worked, the productive as well as the nonproductive hours.
>
> 29 C.F.R. § 778.318(c). The ABC scheme falls on the prohibited side of this exception, because it does not provide, and the parties did not agree, that Plaintiffs' piece rate pay was intended to cover all hours worked.

Madden Ex. K. After some litigation, the matter was settled and Mr. Johnson and his clients were enjoined from suing over the same issue again. *Id.* ¶ 6. LiveBridge modified the generic form of its ABC plans to expressly state that "[a]ll time at work is compensated through ABC Pay" and "ABC Pay rates compensate you for <u>all work time and activities</u> (including time spent reviewing announcements, workspace care, logging on and off systems and recording time and work activities), except for time spent on activities specifically assigned an hourly rate." So, when the Motion discusses 4185 minutes equaling 69.75 paid hours and a remainder of 5.87 hours of uncompensated time, plaintiffs' counsel fully understood that he was misleading the Court, especially when he failed to even mention the applicable regulation.[23] The 4185 production minutes are not a measure of time, but the volume metric that is used as part of the calculation to determine an employee's total compensation for the week. Nunn C13 62:8-10. In fact, the plaintiffs fully understood the plan language as stating that their pay for all time worked was based on calculations involving various metrics, including productive

---

[23] Plaintiffs' entire ABC case is based on the example report on page 6. The Motion (at 5) argues that if you divide the total "Volume" of "Minutes" in the "ABC Task Pay Detail" part of the report by 60, you get fewer hours than the hours listed for the ABC Task Pay in the upper part of the report. The Motion claims that this shows that fewer hours are being paid than are being worked. This is nothing more than a "parlor trick" that they can play because the production unit under this piece rate system happens to be a production minute, rather than a call, an envelope opened, or some other metric. If it was 4185 envelopes opened that totaled $860.78 in compensation for the 75.62 hours worked, there would be no argument about unpaid time. As long as the average hourly rate is above the minimum wage (which is always true because of subsidy pay) and overtime is paid at time and a half times that rate (which it is), there is no argument of unpaid time. Hurley Ex. A.

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 21
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

minutes. *Id.* C1 287:14-289:12.

In addition to these fundamental flaws in the Motion's improper pay scheme argument, plaintiffs also fail to provide any evidence that there is a class-wide policy or that agents are similarly situated. *Sheffield*, 211 F.R.D. at 413 (certification inappropriate when payment structures differ (piece-rate, hourly, and salaried)). Although the ABC plans for LiveBridge's Verizon call centers use production minutes as part of the ABC pay calculation, there is no evidence that this metric is widespread. Instead, many call centers use other metrics, such as calls, faxes, hearings, chats, bookings, sales, or other tasks, to calculate ABC pay. Madden ¶ 3-4. In fact, there are 7862 unique metrics in the FEPS system. Nunn C13 39:3-15. For example, the ABC plan at the Kent Travelocity SBU uses calls and bookings as the production units. *Id.* B29 ¶ 7B. Plaintiffs provide no explanation of how these activities can be divided by 60 to come up with a theoretical gap in time. Moreover, even between ABC plans that do use minutes as a production unit, there are material differences. For example, some SBUs do not count callbacks and waiting for calls as production minutes in their ABC pay calculations whereas other SBUs count essentially all activities, including wait time, callback time and after call work. *Id.* B8 ¶ 11; B34 ¶ 11. In contrast to the lack of evidence from plaintiffs, Defendants have provided a host of declarations from agents testifying that they understand that ABC pay compensates them for all hours worked. *Id.* ¶ 25. These agents further confirm that they are fully paid for all work. *Id.* ¶ 15.

**F.     The Proposed Class Is Not Similarly Situated Because of Unique Defenses Regarding Groups of Potential Class Members.**

When evaluating a request for conditional certification, courts have broad discretion to consider other factors that weigh against notice. It makes no sense to send notice to individuals, inviting them to join a lawsuit, if their claims are barred or otherwise subject to obvious threshold defenses. *Guillen v. Marshalls of MA, Inc.*, 841 F.Supp.2d 797, 802 (S.D.N.Y. 2012) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."). Additionally, it is

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

appropriate to consider individual defenses as a factor under the heightened standard applied

after discovery. *Bowman v. Crossmark*, 2010 WL 2837519 *7 (E.D.Tenn. 2010). There are

numerous threshold defenses here that apply to many agents and that make the requested

notice inappropriate. For instance, the following groups should not be invited to appear in

violation of their commitments or only to be rejected:

- Agents hired after September 27, 2012, who are subject to binding individual arbitration under a dispute resolution plan and are barred from participating in any collective action. Nunn B52 ¶ 4, Exs. B, C. *E.g.*, *Hart*, 2012 WL 6196035 at *2, *5 (certification denied in part because individual inquiry needed into "whether plaintiffs agreed to mandatory arbitration" because declarants subject to arbitration).

- Other agents in Washington and Oregon, who are subject to class settlements and final judgments that release their claims and enjoin or bar them from suing or making claims here. Madden ¶ 6, Ex. J, L.

- Still other agents, who are involved in other actions, including a putative collective action in Texas, *Jones v. Xerox Commercial Solutions, LLC*, and the *Hill* case in this Court. It is improper for those agents to be seeking duplicative relief in two proceedings arising from the same facts; duplication wastes judicial resources. *See Copello v. Boehringer Ingelheim Pharm.*, 812 F.Supp.2d 886, 889-90 (N.D. Ill. 2011).

## IV.   MOTION TO STRIKE

Given plaintiffs' stipulation, any references to Xerox or ACS that appear in each opt-in's declaration should be stricken and the declarations read as referring only to the location where the declarant worked. Madden ¶ 5, Ex. I. However, this stipulation alone does not cure plaintiffs' attempt to rely upon generic and conclusory assertions regarding the existence of policies or practices without providing statements of fact sufficient to show the declarant's personal knowledge of a specific written policy or enforced practice applicable to all members of the proposed class.[24] This same concern applies to the declarants' assertions of specific amounts of unpaid time worked per day or week, given their failure to set forth an evidentiary basis for their calculations. Even if a relaxed standard were applied here despite the significant discovery conducted to date, both of these types of conclusory statements should

---

[24] *Young v. Cate*, 2013 WL 684450 (E.D. Cal. Feb. 22, 2013) (lack of personal knowledge of declarants warranted denial of conditional certification); *Brown v. Citicorp Credit Servs., Inc.*, 2013 WL 4648546 (D. Idaho, Aug 29, 2013) (declining to consider declarations regarding the existence of policy where declarations did not explain basis for personal knowledge); Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 23
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

be stricken due the absence of a specific factual showing based on personal knowledge,[25] particularly given the limited knowledge and recollection it is reasonable to expect of the declarants, since 8 of the 11 are *former* employees (with 6 of those between 1 and 3 years removed from their last day of employment) and one of the 3 current employees has only worked from her home since June 2010 and has no knowledge since that date of the practices at the facility where she once worked. Nunn C8 22:18-22, 31:10-19.

## V.    PROPOSED NOTICE

Plaintiffs proposed notice is clearly flawed. It creates an improper impression of Court involvement, is misleading about recipient rights, and uses inaccurate names and dates. *See Stelmachers v. Maxim Healthcare Servs.*, No. 1:13-cv-1062-RLV at 8-10 (N.D. Ga. Aug. 5, 2013). Also, plaintiffs' request for birthdates and telephone numbers is improper, *id.*, and any information should only be provided, if at all, to a third party administrator. *Morden v. T-Mobile USA, Inc.*, No. C05-2112RSM (W.D. Wash. Nov. 13, 2006). Defendants otherwise request an opportunity to meet and confer in an attempt to address these issues, if necessary.

## VI.    CONCLUSION

This Court should deny the Motion. If Plaintiffs seek to modify the proposed classes or rely on any evidence not submitted with their Motion, Defendants request a surreply to address new matters. Defendants also request oral argument and fees under 29 U.S.C. § 1927.

DATED this 23rd day of October, 2013.

K&L GATES LLP

By /s/ Patrick M. Madden
    Daniel P. Hurley, WSBA #32842
    Patrick M. Madden, WSBA #21356
    Todd L. Nunn, WSBA #23267
    Attorney for Defendants

---

[25] The conclusory statements regarding an alleged "policy" or "practice," and those regarding amounts of allegedly unpaid time, can be found at the citations specified below. Sales Dec. (Dkt. 92) ¶¶5, 7, 10, 11, 13 (also "required"), 14; Fodor Dec. (Dkt. 88) ¶¶4, 6, 8 (also "do not believe"); Belgrano Dec. (Dkt. 94) 5, 7, 9, 10, 11, 13, 14; Tielke Dec. ¶4, 5 (also "expectation"/"required"), 5 (also "required"/"expected"), 6, 8; Clinton Dec. (Dkt. 99) ¶¶5, 7, 8, 9, 10, 12, 13; Green Dec. (Dkt. 93) ¶¶5, 7, 9, 10, 11, 14, 15; Crawford Dec. (Dkt. 90) ¶¶4, 5, 6, 7, 8, 10 (also "do not think"), 12, 14; Cummings Dec. (Dkt. 95) ¶¶5, 7, 9, 10, 12, 13; Chard Dec. (Dkt. 97) ¶¶ 4, 5 ("required"/"expected"), 6, 7, 8; Hawkins Dec. (Dkt. 8

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 24
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2013, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

Marc C. Cote
Toby J. Marshall
TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
206.816-6603
206.350-3528
mcote@tmdwlaw.com
tmarshall@tmdwlaw.com
Co-counsel for Plaintiffs

Jon W. MacLeod
MACLEOD LLC
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
206.357.8470
206.357.8401
jwm@jwmacleodlaw.com
Co-counsel for Plaintiffs

Daniel F. Johnson
Breskin Johnson & Townsend, PLLC
1111 3rd Avenue, Suite 2230
Seattle, WA 98101
djohnson@bjtlegal.com

DATED this 23rd day of October, 2013.

K&L GATES LLP


By /s/ Todd L. Nunn
    Todd L. Nunn, WSBA # 23267

Attorneys for Defendants
Xerox Business Services LLC, LiveBridge,
Inc., Affiliated Computer Services, Inc. and
Affiliated Computer Services, LLC

DEFENDANTS' OPPOSITION TO MOTION
FOR COLLECTIVE ACTION - 25
CASE NO. 2:12-cv-01798-JCC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022